518 A.2d 159

**Richard B. FREED, et ux.**

v.

**WORCESTER COUNTY DEPARTMENT OF SOCIAL SERVICES, et al.**

**No. 370, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Dec. 8, 1986.

Certiorari Denied March 23, 1987.

Walter P. Drake, Ocean City, for appellants.

Mark J. Davis, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on the brief), Baltimore, for appellees.

Submitted before GILBERT, C.J., and ROSALYN B. BELL and POLLITT, JJ.

GILBERT, Chief Judge.

The nation in the early 1970's "discovered" child abuse and neglect. Discovery was not occasioned by the sudden appearance of those two social aberrations but rather because society was awakened to the enormity of the problem. We have come a long way from "the [ancient] Roman laws [that] gave the father a power of life and death over his children." [1] Sir William Blackstone, in his *Commentaries On The Laws of England*, states that "[t]he power of a parent by ... English laws is much more moderate; but still sufficient to keep the child in order and obedience. [The parent] may lawfully correct his child, being under age, in a reasonable manner...." [2] We infer from the words "reasonable manner" that what is not reasonable is unreasonable and hence unlawful.

---

1. 1 W. Blackstone, *Commentaries On The Laws of England* 452 (1778).

2. *Id.*

According to the U.S. Department of Health and Human Services Publication No. (OHDS) 80–30271 entitled "National Analysis of Official Child Neglect and Abuse Reporting (1978)," Maryland reported 3,779 abuse cases in 1978. Neglect cases were not then considered a reportable condition. That same publication contains the statement:

"The problem of child abuse and neglect has not long been on the agenda of social concerns. Within less than a generation it has moved from what was largely a private issue to become a public responsibility. By the middle of 1970, all fifty states, three United [S]tates territories and the District of Columbia [had] enacted legislation mandating the reporting of child maltreatment."

Maryland Senate Joint Resolution No. 16, passed in 1983 by the General Assembly, called upon the Governor to establish a "Task Force on Child Abuse and Neglect" for the purpose of examining and reporting on "various problems associated with [the] issue." The Task Force, in its Preliminary Report of January 1984, said that the "failure to report cases of suspected child abuse and neglect is a major problem" in Maryland.[3] In its "Summary of Preliminary Recommendations For Legislative Action," the Task Force opined that "[m]ost cases of child abuse and neglect go unreported."[4]

Patently, to encourage the reporting of child neglect cases, the Legislature provided that health care practitioners and specified others were required to report cases of

---

**3.** Preliminary Report of the Governor's Task Force on Child Abuse and Neglect, p. 4 (January 1984).

**4.** *Id.* at p. 5. Federal studies indicate that, although child neglect receives less public attention than child abuse, "[c]hild neglect is substantiated following child protective services investigations twice as frequently as all forms of child abuse combined [and] [c]hild fatalities and more severe injury and/or impairment are more frequently associated with neglect than with abuse." Office of Human Development Services, U.S. Department of Health and Human Services, Perspectives on Child Maltreatment in the Mid '80s 15 (1984).

neglected children.   Laws 1978, ch. 880 conferred immunity from civil action upon the reporter of neglect.[5]

Subsequently in Laws 1983, ch. 492, the General Assembly recognized that persons required to report were but one source for the reporting of neglect to children and mandated that "[a]ny person other than a health practitioner, law enforcement agency, police officer, educator or social worker who has a reasonable belief that a child is a neglected child may file with the local department [of social services [6]] an oral or written report of the suspected neglect." [7]

To assure itself that reports of suspected child neglect would be forthcoming from those who were not required to report, the Legislature cloaked the informant with immunity by providing in Family Law Art. § 5–708:

"Any person other than a person suspected of child neglect who in good faith makes or participates in making a report of neglect under § 5–704 of this subtitle or participates in an investigation or a resulting judicial proceeding is immune from any civil liability or criminal penalty that would otherwise result."

"Neglected child" is defined in Family Law Art. § 5–701(g) to mean:

"a minor child who has suffered or is suffering significant physical or mental harm or injury from:

(1) the absence of the child's parents, guardian, or custodian; or

(2) the failure of the child's parents, guardian, or custodian to give proper care and attention to the child and the child's problems under circumstances that indicate that the child's health or welfare is harmed or threatened thereby, unless the failure consists only of providing the

---

**5.**  Maryland Code, Family Law Article Ann., §§ 5–702(1)–(2), 5–704(a), 5–708 (1984 and Supp.1986).

**6.**  Family Law Art. § 5–701(f).

**7.**  Family Law Art. § 5–704(c).

child with nonmedical remedial care and treatment recognized by State law instead of medical treatment."

With that brief background firmly in mind, we turn to the matter *sub judice.*

The Worcester County Department of Social Services (Social Services) received a report in August 1985 of suspected child neglect involving children of Richard and Paula Freed. After an investigation, Social Services "ruled out" any child neglect.[8]

The Freeds took the position that the report of child neglect was made in bad faith and without any basis. They expressed their intent to file common law actions against the reporter, whomever that might be. To determine the identity of the informant, the Freeds endeavored to obtain from Social Services officials the name of the person who made the child neglect report, but all attempts were rebuffed.

The Freeds then filed a two count complaint in the Circuit Court for Worcester County. They named as defendants the State, Social Services, and three employees of Social Services who were involved in the investigation of the child neglect report, but who steadfastly refused to identify the informant.[9] Among the remedies sought by the Freeds was a writ of mandamus to compel Social Services to disclose the name of the person who reported the child neglect. Additionally, the Freeds, in a 42 U.S.C. § 1983 action, asked for money damages. The latter claim was grounded on an alleged violation of "constitutionally protected rights." They also requested that Social Services be required to

---

**8.** COMAR .07.02.07.09F(2) defines "ruled out" to mean
"that there is no evidence that the child has been or is being harmed or that the level of the child's care is below minimally acceptable standards.... Child neglect is ruled out when, after investigation, it is found that the parent, guardian, or custodian is present, and is giving proper care and attention to the child and his problems." *See* Family Law Article, § 5–705(c)(1)(ii).

**9.** The defendants are hereafter collectively referred to as Social Services.

reveal the source of the child neglect report and a permanent injunction be issued requiring Social Services "to disclose the name of a [reporter of suspected child neglect] where neglect is ruled out" by Social Services.[10]

All of the defendants, pursuant to Md. Rule 2–322(b)(2), filed a motion to dismiss the complaint on the ground that it failed to state a claim upon which relief could be granted. Judge Theodore R. Eschenburg dismissed the suit, and this appeal ensued.

## I

■ A writ of mandamus is an "extraordinary remedy ... based upon reasons of justice and public policy to preserve peace, order and good government." *Ipes v. Board of Fire Commissioners of Baltimore,* 224 Md. 180, 183, 167 A.2d 337, 339 (1961).

> "The office of mandamus, as generally used, is to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right."

*Criminal Injuries Compensation Board v. Gould,* 273 Md. 486, 514, 331 A.2d 55, 72 (1975). *See State ex rel. Henderson v. Taylor,* 59 Md. 338, 344 (1883). In this case there is neither "imperative" duty on the part of Social Services nor the "clear legal right" in the Freeds.

The Legislature in Laws 1983, ch. 492 adjusted Maryland's child neglect statutes to conform with federal regula-

---

**10.** We observe that by seeking injunctive relief the Freeds, if successful, would be entitled to an award of a counsel fee to their attorney even though they recovered no damages. *Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), *aff'g sub nom. Allen v. Burke,* 690 F.2d 376 (4th Cir.1982); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), *aff'g* 548 F.2d 740 (8th Cir.1977), *aff'g* 410 F.Supp. 251 (E.D.Ark.1976).

tions.[11] There is nothing in those statutes that creates a *duty* on the part of the appellees to reveal the identity of the person who reported the suspected child neglect. On the contrary, Social Services's duty is to "safeguard" the requested information. *See* COMAR .07.01.02.01.

The Freeds point to Md.Ann.Code art. 88A, § 6(b), which provides in pertinent part:

"Except as otherwise provided in Title 5, Subtitle 9 of the Family Law Article, all records and reports concerning child abuse or neglect are confidential, and their unauthorized disclosure is a criminal offense subject to the penalty set out in subsection (e) of this section. Information contained in reports or records concerning child abuse or neglect may be disclosed only:

(1) Under a court order[.]"

From that statute they deduce that the trial court, on the authority of § 6(b), should have compelled Social Services to disclose the name of the person who reported the suspected neglect. Without that information, the Freeds maintain they are unable to demonstrate that the report made to Social Services was not founded on a "reasonable belief."

■ We think the Freeds misread and misinterpret § 6(b) of article 88A. The power conferred upon a court to order disclosure is not a broad grant of authority to emasculate the protective provisions of the statutes. Rather it is a recognition that when the information is relevant to some other purpose such as adoption, custody, guardianship, and visitation, the court may require the agency to disclose the protested matter. Of course, even then the court is empowered to seal the record and preclude further disclosure. The statute was never intended to be a vehicle to permit the willy-nilly disclosure of the very records the Legislature sought to keep confidential. Indeed, the purpose behind the nondisclosure laws is to encourage the reporting of child

---

**11.** Child Abuse Prevention and Treatment Act of 1974, Pub.L. No. 93–247, 88 Stat. 4, now codified as 42 U.S.C. §§ 5101–5107 (1982). *See* 42 U.S.C. § 5103(b); 45 C.F.R. § 1340.14(i)(1) and (i)(2)(viii).

neglect cases. To accomplish that objective, the Legislature conferred immunity upon the informant who acts on a reasonable belief. Were we to allow a court to order disclosure merely upon demand or upon the parent's or guardian's belief that the disclosure was made in bad faith, the nondisclosure statutes would be severely eroded, if not effectively eliminated.

The statutes foreclose the easiest manner of determining the identity of the person who reports suspected child neglect. Those persons who are aggrieved at being unjustly reported are at liberty, however, to employ whatever lawful investigative processes are available so as to ascertain the identity of the informer. Admittedly, their task is made difficult by the nondisclosure statutes, but then that is presumably what was intended by the Legislature.

Judge Eschenburg properly dismissed the complaint with respect to the action for mandamus.

## II

In an action founded on 42 U.S.C. § 1983, the Freeds assert that they were deprived of the following constitutional rights: access to the courts, right to a remedy to redress a wrong, procedural due process, and equal protection.

Two elements are essential for recovery under § 1983: (1) conduct "under color of any statute, ordinance, regulation, custom, or usage, of any State ...," and (2) "deprivation of any rights, privileges, or immunities secured by the [United States] Constitution and laws." The parties do not contest the fact that the actions complained of in this case were under the color of state statutes and regulations.

Appellants argue that their "right of access to the [c]ourt has been denied ... because the failure of the [Social Services] to provide the name of the [reporter] has made it impossible to sue such person for making the unfounded

complaint." That argument falls short because it confuses difficulty with impossibility and frustration with failure.

■ Judge Alpert, writing for this Court in *Boyds Civic Association v. Montgomery County Council,* 67 Md.App. 131, 146, 506 A.2d 675, 683 (1986), said that § 1983 provides a remedy when constitutional rights are actually encroached upon, not when a bare threat to infringement occurs. In the instant case, Social Services's refusal to identify the informant may have stalled the Freeds' legal action against the person who reported the neglect, but action is not "impossible," just difficult.

Appellants correctly note that the immunity granted in Family Law Article, § 5–708 applies only if the report is made in good faith.[12] We acknowledge, too, "[a]s is almost always the case, the question of 'good faith' presents a triable issue of fact." *Doe v. County of Suffolk,* 494 F.Supp. 179, 183 n. 4 (E.D.N.Y.1980).[13] Nevertheless, no one has the right to obtain the name of the reporter from Social Services for the purpose of initiating litigation under 42 U.S.C. § 1983. However the Freeds proceed to identify and sue the informant is for them to decide. We merely

---

12. Statutes in Arkansas, Colorado, Florida, Illinois, Indiana, Maine, Michigan, Mississippi, Montana, New Mexico, New York, North Dakota, Pennsylvania, South Carolina, Tennessee, Wisconsin, and Wyoming have included an explicit presumption that reports of child neglect are made in "good faith." Similar provisions have been found in statutes of the District of Columbia, American Samoa, and Guam. *See* Office of Human Development Services, U.S. Department of Health, Education, and Welfare, Child Abuse & Neglect, State Reporting Laws 10–11 (1979). Maryland's immunity provision in Family Law Article, § 5–708 does not specify such a presumption. Practically, however, good faith is initially presumed since the burden of proving bad faith must be met by the person asserting it.

13. *Doe* involved good faith immunity granted to persons participating in the making of reports of suspected child neglect under New York's child protective services laws. *See* Krause, *Child Abuse and Neglect Reporting Legislation in Missouri,* 42 Mo.L.Rev. 207 (1977); Katz, Howe, and McGrath, *Child Neglect Laws in America,* 9 Fam.L.Q. 1 (1975); Sussman, *Reporting Child Abuse: A Review of the Literature,* 8 Fam.L.Q. 245 (1974).

hold that they may not obtain that identity through Social Services.

The Freeds aver that they have been denied equal protection of the law. To support that bald allegation, they query as to what the State's interest is in protecting the identity of persons who in bad faith report child neglect cases. The question put by the appellants demonstrates their misunderstanding of the Legislative intent as well as their desire for revenge against the person or persons who reported them to Social Services. The Freeds overlook Justice Douglas's words in *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955), that "[t]he prohibition of the Equal Protection Clause goes no further than the invidious discrimination."

■ Irrespective of the Freeds' sense of outrage, they have not been denied equal protection of the laws; no invidious discrimination has been demonstrated by them. The State has a rational basis for protecting reporters of child neglect. The premise for the statute is to encourage reports of child neglect, concomitantly discourage incidents thereof, and simultaneously provide protection to those least able to protect themselves. A statutory classification survives a constitutional challenge if the statute is grounded on a rational basis. *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 642, 458 A.2d 758, 782 (1983); *Attorney General of Maryland v. Waldron*, 289 Md. 683, 707, 426 A.2d 929, 942 (1981).

Under the *Hornbeck* and *Waldron* tests, Family Law Article §§ 5–704(c) and 5–708 and Md.Ann.Code art. 88A, § (6)(b) pass constitutional muster.

Moreover, the Freeds, if and when they learn the identity of the person who reported the suspected child neglect, may resort to the court for redress.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.