873 A.2d 417

**William C. BOND**

v.

**Gerald A. MESSERMAN, et al.**

**No. 1067, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

April 28, 2005.

Timothy M. Gunning, Towson (Richard M. Karceski, on brief), for appellant.

Daniel J. Moore, Towson, for appellee.

Panel DAVIS, SALMON, RAYMOND G. THIEME, JR., (retired, specially assigned), JJ.

DAVIS, J.

Appellant, William C. Bond, filed suit against appellees, Gerald A. Messerman and Sheppard Pratt Health System, Inc. (Sheppard Pratt) on February 4, 2003 in the Circuit Court for Baltimore City, alleging legal malpractice, negligent mis-

representation, breach of fiduciary duty and constructive fraud, stemming from Messerman's failure to expunge appellant's Ohio juvenile records. On April 11, 2003, appellant filed a motion to dismiss for lack of personal jurisdiction and a hearing on the motion was held on May 14, 2003. The Court (Matricciani, J.) held the matter *sub curia*, and issued a written Order on May 16, 2003, granting appellant's motion, ruling: "[U]nder the facts and circumstances of this case, the court can exercise neither general nor specific personal jurisdiction over [appellee]." On May 3, 2004, another member of the circuit court (Berger, J.) issued an oral ruling, granting the summary judgment motion filed by Sheppard Pratt Health Systems. From the circuit court's grant of Messerman's motion to dismiss and Sheppard Pratt's motion for summary judgment, Bond noted this appeal, presenting two questions for our review:

    I.    Did the circuit court err by ruling [that] it could not exercise personal jurisdiction over Messerman?

    II.    Did the circuit court err in granting summary judgment on Count V (negligence) in favor of [Sheppard Pratt]?

Finding no error, we shall affirm the judgment.

## BACKGROUND

On June 19, 1981, in the garage of his grandparents' home in Chagrin Falls, Ohio, little more than seven months before his eighteenth birthday, appellant bludgeoned his father to death with a hammer. After murdering his father, appellant stuffed the body into the trunk of his father's car, drove it to an isolated location, and left the car there. A warrant for appellant's arrest was issued three days later.

Messerman, an Ohio attorney, was retained to represent appellant. On July 1, 1981, Judge Frank G. Lavrich, of the Juvenile Division of the Geauga County, Ohio Common Pleas Court, heard sufficient evidence "tending to show that there is reason to believe that William Rovtar [1] did commit the of-

---

1.  Appellant was born William Crockett Rovtar, but changed his name after the events described here.

fense as charged in the complaint and that said act would constitute a felony if committed by an adult." The judge ordered that appellant be held at the Geauga Juvenile Center and undergo psychological testing.

The fact that the hearing occurred, but not its contents, was reported in a July 9, 1981, article in a local newspaper, the *Chagrin Valley Herald Sun.* The article stated:

> Geauga County Juvenile Judge Frank Lavrich ruled last week that there is sufficient grounds for the arrest of William Rovtar, 17, charged with the murder June 19 of his father, Mirko Rovtar, Jr., 37, in Bainbridge Township.
>
> Lavrich made his decision after hearing testimony and evidence for nearly 2½ hours. He also ordered psychiatric testing for Rovtar, required for juveniles under Ohio law.
>
> . . . .
>
> According to Robert Shields, chief probation officer for Geauga County, psychiatric testing of Rovtar will begin next week at the Ohio Youth Commission's Scioto Village Diagnostic Center in Powell, Ohio.
>
> Shields said that in addition to the psychiatric testing, a social investigation of the boy has begun.
>
> Rovtar is a student at University School in Pepper Pike, where he was to begin his senior year in September.

On August 31, 1981, based on an agreement Messerman negotiated with the prosecutor, Judge Lavrich agreed to retain jurisdiction in the Juvenile Division, and he accepted appellant's guilty plea to his father's murder. Part of the plea agreement included appellant's commitment to a psychiatric hospital, and Messerman located and recommended Sheppard Pratt, in Baltimore County, Maryland, as a suitable hospital. Appellant alleges that he and Messerman "discussed the concept of expungement in 1981, prior to the proffer of the delinquent plea . . ., its legal effects under Ohio law and the importance to [appellant] of being able to expunge his juvenile record."

The juvenile court's order described the disposition preliminarily imposed:

William Rovtar was committed to the permanent custody of the Ohio Youth Commission.... Execution of the commitment [sic] was suspended pending an evaluation of 60 day duration at a Mental Health facility, the Pratt Shephard Hospital [sic] regarding the suitability and feasibility of said William Rovtar being committed to such facility for treatment, care and counseling. Said hospital to submit to the Court a report accepting said juvenile as a suitable patient along with a diagnosis, prognosis, program of treatment and care and the projected duration of such program.

In a September 1, 1981 article in the *Geauga Times Leader*, the prosecutor, Craig Albert, was quoted as saying, "Commitment cannot last beyond his 21st birthday."

In fulfillment of the juvenile court's order, after appellant spent approximately sixty days at Sheppard Pratt, Judge Lavrich received the following report from Kay Pak Koller, M.D., a psychiatrist at the hospital:

William Rovtar has been an inpatient at this facility since September 23, 1981. He has been receiving intensive psychiatric treatment which include [sic] three times per week individual psychotherapy and four times per week group psychotherapy, including 24 hour nursing care and other therapies.

William has been responding to the therapeutic approach. Currently, he uses less denial and has gained better insight into his problems. Without intensive psychotherapy in the hospital setting, he is considered to be suicidal as he became aware of his previous violent act. Thus, it is strongly recommended of [sic] long term hospitalization in order to work through his conflicts and depression.

His prognosis appears to be good since he is responding to the intensive psychotherapy in the hospital setting.

After receiving that report and holding a hearing, Judge Lavrich ordered final disposition on December 11, 1981:

The Sheppard and Enoch Pratt Hospital having duly made its diagnosis and treatment plan for the respondent, William Rovtar and the Court finding same to be appropriate and in the best interest of the minor and the community interest, same is hereby approved. William Rovtar is hereby placed in the temporary custody of the Sheppard and Enoch Pratt Hospital for care and treatment.

Sheppard Pratt released appellant from its custody on July 31, 1982; appellant spent less than a year in the hospital.

Appellant's father's estate was settled in 1982. On June 14, 1982 (shortly before appellant's release), Messerman sent a letter to appellant at Sheppard Pratt, advising him that his grandfather, as executor of his father's estate, had filed a declaratory judgment action regarding the estate. Paragraph 9 of the complaint in that case alleged:

9. Plaintiff further states that on August 31, 1981, WILLIAM C. ROVTAR was found to be a "delinquent" by causing the death of his father, MIRKO L. ROVTAR, JR., and remanded to the permanent custody of the Ohio Youth Commission but the execution of the commitment was suspended pending an evaluation of sixty (60) days duration at a mental health facility; on December 11, 1981 the Juvenile Court Division of the Court of Common Pleas of Geauga County, Ohio placed WILLIAM C. ROVTAR in the temporary custody of the SHEPPARD & ENOCH PRATT HOSPITAL in Towson, Maryland for care and treatment, as is more particularly set forth in Case No. 81J379 of the Records of the Juvenile Court Division of the Court of Common Pleas, Geauga County, Ohio.

Additionally, a motion to intervene in that case was filed by the Insurance Company of North America. The insurer's motion explained its dilemma:

Intervenor is uncertain as to whether or not it should pay insurance funds to, William C. Rovtar, due to the fact that said, William C. Rovtar, has been found delinquent by causing the death of decedent, intervenor's insured. . . .

Messerman's June 14, 1982 letter informed appellant of these issues, and advised him to accept a settlement he was helping to negotiate with the other parties.

On September 13, 1982, after another hearing, the juvenile court placed appellant on probation until his twenty-first birthday, requiring him to continue his outpatient treatment with Sheppard Pratt. After appellant turned twenty-one, the court terminated his probation on February 22, 1985. Later that year, around December 4, 1985, appellant received a letter from his probation officer confirming that his probation had terminated, and explaining that appellant could "file an application, available from this Court, for the expungement of [appellant's] juvenile record two years from this action." In 1985, Messerman allegedly told appellant that his "juvenile record would be expunged" and that appellant "would never have to admit to the existence of the juvenile case once the record was expunged."

Appellant alleges that he called Messerman shortly after receiving the probation officer's letter, reminding Messerman of his desire to have his juvenile records expunged. In a letter of January 17, 1986, addressed to appellant at his St. Paul Street address in Baltimore City, and printed on "Messerman & Messerman" law firm stationery, Messerman asked, "Please remind me in two years to file an application for expungement and I will do so." Appellant called Messerman soon thereafter, saying that because Messerman had been paid $25,000 to represent appellant,[2] Messerman ought to file for expungement without the necessity of a reminder. Messerman agreed.

Eight years later, appellant wrote to Messerman on May 12, 1994:

Dear Gerry,

Its [sic] been quite a while since you've heard from me. I've been back and forth between Baltimore and Jamaica working as a tennis pro. In the mean time [sic], I've been

---

2. Appellant does not contend that he paid Messerman.

working very hard to develop myself as a human being and as a writer. It looks like my diligence is about to pay off. I've been signed by an L.A. entertainment agency to market the literary and dramatic rights to my book tentatively titled SELF–PORTRAIT of a PATRICIDE. If I can believe what I'm being told my writing will be received as literature and will make a positive social statement.

Presently, I am on a 45 day revision deadline and there are a few documents that I need from you. . . .

1) I need transcripts of the sentencing.

2) I am missing any records indicating that my juvenile record was expunged. Was it? If it was I need a record of it. If it wasn't can we have it expunged now?

Soon thereafter, on May 16, 1994, Messerman wrote back to appellant at his Cockeysville, Maryland address, this time on the stationery of "Duvin, Cahn, Barnard & Messerman":

Dear Bill:

I am glad to hear that you are healthy and creative.

I would be delighted to review your book. Is it finished?

I don't have transcripts of your sentencing. We never ordered any transcripts. I know of none currently available.

There is no procedure for expunging your juvenile record. It is automatically "expunged" in the sense that it is private, confidential and sealed. It is not a criminal record. You don't have to worry about it.

In a June 2, 1994 letter, appellant responded:

Dear Gerry,

Thank you for your quick response to my letter. I am enclosing two letters, one from the court dated 12/5/85 and one from you dated 1/86. If, as you say in your recent letter, that my record is automatically expunged then why is a reference made in both of the enclosed letters to filing for expungement? Also, if I on my own volition make my case public then does that give the court implied permission to

make my entire record public based on some kind of public domain theory?

I am currently revising my book. My agent is planning to auction it to publishers either at the end of June or early July. I will send you a revised copy as soon as my revisions are complete.

Appellant called Messerman around that same date. During their conversation, Messerman reiterated that the juvenile records were expunged, and again advised appellant that he "would never have to admit to the existence of the juvenile case" and assured appellant that he "had nothing to worry about."

In the fall of 1993, appellant bought a .38 caliber Smith & Wesson revolver from a gun shop on Harford Road, in Baltimore County. In the spring of 1994, appellant bought a Glock 9mm handgun from the same dealer. Later that year, appellant bought a second Glock 9mm and, in the winter of 1994–1995, appellant bought a Beretta .25 caliber pistol; both of those weapons were purchased from a gun shop on Falls Road, just north of Baltimore City. In each of the firearm purchase applications, appellant certified that he had never spent more than thirty consecutive days in a medical institution for treatment of a mental disorder. *See* Md.Code (2003 Repl.Vol., 2004 Supp.), Public Safety § 5–118(b)(3)(vii) (previously codified at Art. 27 § 442).

Appellant, of course, had spent more than thirty days in such an institution. His affidavit explains:

I entered "no" when asked whether I had ever been committed to a mental institution on each of the applications to purchase handguns because Mr. Messerman had told me several times in writing and on the telephone that my juvenile records would be and/or had been expunged and that therefore the matters contained in the records were "deemed never to have occurred" and that I would never have to admit to the existence of the juvenile case.

Appellant married Alyson Blum Slavin in 2001. At this point, the chronology of the present case intersects with the

facts recounted in the Fourth Circuit's opinion in *Bond v. Blum*, 317 F.3d 385, 390–91 (4th Cir.2003):

In the child-custody case of *Slavin v. Slavin*, commenced in July 2000 and pending in the Circuit Court for Baltimore City, Case No. 95249006/CE 201677, Alyson Slavin Bond sued her former husband, William Slavin, for exclusive custody of their three children. William Slavin filed a cross-petition for exclusive custody and, in support of his position, introduced into evidence an autobiographical manuscript written by Alyson's current husband, William Bond, to establish that the home of Alyson and William Bond would not be a suitable place for the three children. Bond's manuscript was entitled *Self–Portrait of a Patricide: How I Got Away with Murder.*

. . . .

In 1987, Bond began to write *Self–Portrait of a Patricide: How I Got Away with Murder*, "the true story of and by William Bond," which he hoped to market to publishers for profit. The manuscript describes in horrific detail how Bond planned and committed the murder of his father with a hammer, and how his dying father attempted to raise himself off the floor of the garage before Bond delivered the final blows to his neck and head. It describes Bond wiping away his fingerprints, scrubbing the garage floor, cleaning blood, flesh, and bone from his clothes, and stuffing his father's dead body in his car's trunk. Most sinister of all, it depicts a remorseless individual who brags about fooling the police and the juvenile system to "get away scot-free" and even collecting, as planned, the money from his father's estate. Although verifiable facts of the murder are consistent with the details provided in the manuscript, Bond has now stated in an affidavit that the manuscript is "a highly fictionalized and stylized work," based on his "juvenile experience." Bond circulated his manuscript directly and through agents in order to find a publisher, asking for a seven-figure advance. His efforts, however, were unsuccessful. After some revisions, Bond also gave a copy of the manuscript to Norman Pessin, [a Maryland] attorney who

had represented Bond in various unrelated matters, to help him get the manuscript published, but his efforts, too, failed. Although Pessin thereafter died, his widow retained a copy of the manuscript.

Bond met Alyson Slavin in early 1995, after Alyson was separated from her husband, William Slavin. Bond and Alyson continued to see each other until they married in May 2001. In 1996, shortly after Bond and Alyson met, Bond wrote a lengthy letter to Alyson's father, Kenneth Blum, Sr., indicating that he intended to marry Alyson and become the stepfather of her children. The letter offered an analysis of individual members of Blum's family and purported to offer "solutions" to correct perceived deficiencies in the Blum–Slavin extended family. In addition, the letter set forth an expansive financial plan, pursuant to which Bond demanded from Blum a dowry, a salary, establishment of an investment account, purchase of a studio apartment in addition to a house, and a severance package should Bond's marriage with Alyson not work out. Bond stated to Blum, "You can pay me now or pay me later." In this letter, Bond also made reference to his personal history, stating that he "had a past," and that, although it was "none of [Blum's] business," it makes "interesting reading."

Blum not only found this letter very disconcerting, considering it to be an attempt to extort money from him, but he also became concerned for the safety of Alyson and her children. In June 2000, just before the state custody action was commenced, Blum hired a private investigator, Dudley F.B. Hodgson, to look into Bond's background. At their first meeting, Blum gave Hodgson an overview of his dealings with Bond and expressed his concern over both the safety of his grandchildren and Bond's effort to "shake him down" for money. Blum gave Hodgson a copy of the letter that Bond had sent him and told Hodgson that he had heard that Bond may have had some problems with his family involving violence in Ohio.

In the course of his investigation, Hodgson learned about the murder of Bond's father and contacted the Bainbridge,

Ohio police department, obtaining copies of the police report and other documents relating to the homicide investigation. Hodgson reported these findings to Blum, and at Blum's request, Hodgson went to the home of Miriam Pessin, the widow of Norman Pessin, believing that Bond had also tried to "shake Pessin down" for money before he died. When Hodgson interviewed Miriam Pessin in April 2001 and asked her if she had any information that would be helpful in his investigation of Bond, she told Hodgson that she did have, stored in a box, a loose-leaf copy of a manuscript that Bond authored. Mrs. Pessin stated that Bond had given a copy of the manuscript to her husband for him to read for the purposes of locating a publisher. She later testified that this box of materials was not part of Pessin's legal files, which he carefully kept separate, and that Bond had also given her portions of the manuscript to read. Not wanting to retain the manuscript in her home, Mrs. Pessin gave it to Hodgson. Hodgson made a copy of the manuscript and gave copies to Alyson's ex-husband, William Slavin, and the attorneys representing him in the state custody action. William Slavin's attorneys made the manuscript an exhibit during the deposition of Alyson in July 2001 and intended to make it a part of the custody litigation in the Circuit Court for Baltimore City, in which a hearing was scheduled for December 10, 2001. For the sole purpose of preventing further use of the manuscript in the proceedings before the Baltimore City Circuit Court, Bond registered a copy of his manuscript with the Copyright Office in August 2001.

Immediately after registering the manuscript, Bond commenced this action for copyright infringement, naming as defendants Blum, Blum's son, Hodgson, William Slavin, and Slavin's attorneys. He requested a preliminary and permanent injunction prohibiting the use of the manuscript by the defendants for any purpose and requiring the return of all existing copies.

See also Bond v. Slavin, 157 Md.App. 340, 851 A.2d 598 (2004). Ultimately, the Fourth Circuit held that use of appellant's

book in the domestic proceedings amounted to "fair use" under 17 U.S.C. § 107.

In appellant's complaint in the present case, he alleges that during May 2001, Dudley Hodgson contacted the Maryland State Police to tell them that appellant had been committed to Sheppard Pratt as a juvenile for the death of his father. Hodgson also gave the State Police a copy of appellant's manuscript and an Ohio police report, which included Ohio court records. On investigating this information, the State Police also learned of appellant's handgun purchases and, upon their request, the Geauga County Court of Common Pleas sent copies of court records indicating that appellant had not truthfully answered the question as to whether he had ever been institutionalized for more than thirty days. With this information, the State Police obtained a warrant and arrested appellant on May 25, 2001.

The State's Attorney for Baltimore City charged appellant with illegally possessing eight handguns and, in the Circuit Court for Howard County, the Attorney General's Office charged appellant with two counts of providing false information on his handgun purchase applications. On or about July 20, 2001, Sheppard Pratt received a subpoena requiring the hospital to provide to the State's Attorney's Office "all certified medical records pertaining to" appellant's inpatient treatment. In response, records custodians at Sheppard Pratt sent copies of all their records on appellant—both medical records and mental health records—to the State's Attorney's Office.

The subpoena Sheppard Pratt received was irregular. In a memorandum opinion issued in the course of the City's prosecution, Judge Allen L. Schwait explained:

The defendant argues that highly confidential privileged records of his treatment at Sheppard Pratt were subpoenaed by way of a grand jury subpoena despite the fact that a grand jury was never impaneled to investigate the defendant. As a result of the improper subpoena, the State received this confidential and privileged information without protest and without any notification to the defendant.

The subpoena was issued by the State's Attorney's Office and the circumstances of its issuance were stipulated to in lieu of testimony at the motions hearings. Assistans [sic] State's Attorney Douglas Ludwig accepted full responsibility for what was, apparently, an unintentional issuance of a subpoena *duces tecum* with language that indicated the subpoena was a grand jury subpoena.

The particular language appeared at the bottom of the subpoena, just above a Circuit Court Judge's signature, as the following paragraph:

"The above should be furnished to the State's Attorney's Office five (5) days after service for it's [sic] appearance and use in the Circuit Court for Baltimore City. You are further directed, in accordance with the secrecy of investigations before the Grand Jury, not to disclose the existence of the Subpoena Duces Tecum."

Additionally, the subpoena was captioned "STATE VS. SPECIAL INVESTIGATION," with no case number, although it was actually issued in the course of State v. Bond, Case nos. 201176015–16.

Sheppard Pratt's Records Custodian testified in a deposition that she knew the records request was not a court order, but she also testified that she immediately complied with the request, and treated it as a court order, because Judge Heard's signature appeared on the document. Sheppard Pratt's written policy governing records requests provided:

SUBPOENAS, COURT ORDERS

Subpoenas can come through the mail, be personally delivered or may come via fax. A subpoena must have a copy of a certificate to the patient and/or their attorney notifying her/her/them [sic] that the records are being subpoenaed, the date of the hearing and that they have the option to file a Protective Order or Motion to Quash. If there is no certificate, a letter is sent to the attorney advising them of the statutes.

There was no such certificate accompanying the records request to Sheppard Pratt. Sheppard Pratt's policy went on to state:

CRIMINAL PROCEEDINGS:

If a patient has committed a criminal act and the records are being subpoenaed for court—THEY DO NOT REQUIRE A CERTIFICATE OR A RELEASE. The records MUST be sent out. IF the patient is a witness to a criminal act or is somehow involved in the case, but the patient IS NOT THE ONE THE CHARGES ARE BEING BROUGHT AGAINST, we must have a certificate or a release.

Finally, the policy stated:

COURT ORDER from a judge—often regarding a child— WE MUST SEND OUT ASAP. /s/ _____ with seal of the court at the bottom does not have to be actually signed by the judge. The judge does NOT HAVE TO literally sign.

Neither of the firearms prosecutions resulted in a conviction. The Baltimore City case was dismissed, and in Howard County, by the parties' stipulation, the case was placed on the "stet" docket on condition that appellant forfeit his firearms to the State and not possess any other guns for one year.

## LEGAL ANALYSIS

### I

Appellant argues that the circuit court could assert personal jurisdiction over Messerman under several of Maryland's long-arm jurisdiction provisions: Md.Code (2002 Repl.Vol.), Cts. & Jud. Proc. (C.J.), § 6–103(b)(1), (3), or (4).[3] In response,

---

3.  C.J. § 6–103, Maryland's long-arm statute provides in part:
    (b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by an agent:
       (1) Transacts any business or performs any character of work or service in the State;
       \*       \*       \*

Messerman generally argues that the due process clause of the Fourteenth Amendment prohibits Maryland from asserting jurisdiction over him because he lacks minimum contacts with the State, but he also argues that the facts of this case do not fit C.J. § 6–103(b)(3) or (b)(4).[4]

In *Geelhoed v. Jensen,* 277 Md. 220, 224, 352 A.2d 818 (1976), the Court of Appeals explained:

> Application of the long arm statute is a two-step process. First, it must be determined whether the statute purports to authorize the assertion of personal jurisdiction. And secondly, it must be determined whether an exercise of jurisdiction permitted by the statute violates the Due Process Clause of the Fourteenth Amendment. It is important to note, however, that these determinations are interrelated. As noted repeatedly in the cases, the long arm statute represents an effort by the Legislature to expand the boundaries of permissible in personam jurisdiction to the limits permitted by the Federal Constitution. It is therefore necessary to interpret the statute in light of constitutional limitations, rendering where possible an interpretation consistent with those limitations.

*But see also Lawson v. Balt. Paint and Chemical Corp.,* 298 F.Supp. 373, 378 (D.Md.1969); John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland Civil Procedure* § 3.3(c)(3)(b) (2d. ed.2004) (both authorities observing that the long-arm statute stops short of constitutional limits in some respects).

---

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State.

4. Messerman only argues that jurisdiction is not appropriate under C.J. § 6–103(b)(1) insofar as he generally argues that he lacks requisite minimum contacts for Maryland courts to assert personal jurisdiction. That is, Messerman has not argued that the facts of this case do not fit C.J. § 6–103(b)(1).

## A

Appellant first argues that jurisdiction is proper under C.J. § 6–103(b)(1) ("transacts any business or performs any character of work or service in the State") because Messerman advised appellant, in letters and over the phone, that his juvenile record had been expunged and that the matters contained therein were "deemed never to have occurred." Messerman's advisements, according to appellant, were legal services performed in Maryland.

In making his due process argument, Messerman insists that the State of Maryland does not have *in personam* jurisdiction over him because *he* never was within the territorial limits of the State. He fails to address, however, the significance of his communications with his client in Maryland. Under § 6–103(b)(1), "The defendant need never have been physically present in the state." *Bahn v. Chi. Motor Club Ins. Co.,* 98 Md.App. 559, 568, 634 A.2d 63 (1993).[5] We have previously held that, under § 6–103(b)(3), sending a defamatory letter into Maryland does not amount to causing tortious injury in Maryland by an act or omission in Maryland. *See Zinz v. Evans & Mitchell Indus.,* 22 Md.App. 126, 324 A.2d 140 (1974); *see also* Lynch, *supra,* § 3.3(c)(3)(a) at 3–39 to 3–40. But, more recently, the Court of Appeals has held that one who sends communications into Maryland can be found to have transacted business in the State, without ever entering the State, under § 6–103(b)(1). *Id.* at 3–40 to 3–43.

Our analysis in a determination of whether Messerman's actions constituted the practice of law in Maryland is to be distinguished from the question of whether there were minimum contacts under a Due Process analysis, although both focus on his actions. Our research has uncovered numerous

---

5. Additionally, under § 6–103(b)(1), "acts done within a State which will support *in personam* jurisdiction as transacting 'any business' are not necessarily limited to acts which are a part of commerce or of transactions for profit, but include acts which constitute a purposeful activity within the State." *Novack v. Nat'l Hot Rod Ass'n,* 247 Md. 350, 356, 231 A.2d 22 (1967).

decisions in which the question of whether a defendant's actions brought it within the Long Arm Statute was uncontested, and jurisdiction devolved upon the nature and extent of the contacts with the forum state. *See Bahn,* 98 Md.App. 559, 634 A.2d 63. There is, however, a dearth of authority regarding the providing of advice or counsel, legal or otherwise, by correspondence or telephone. *See Giannaris v. Cheng,* 219 F.Supp.2d 687 (D.Md.2002)(holding there was *in personam* jurisdiction over out-of-state attorneys sued for legal malpractice where cause of action *arose from litigation in Maryland* ); *see also Busch v. Buchman, Buchman & O'Brien Law Firm,* 11 F.3d 1255 (5th Cir. 1994) (holding that there was personal jurisdiction to sue New York law firm for tax opinion which rendered advice that violated Securities and Exchange Act of 1934, despite the fact that defendant committed no act in Texas, the forum state, which violated the Act; although the decision was based on a minimums contacts analysis, the court considered providing legal advice telephonically as the practice of law). In *Lawson v. Baltimore Paint and Chemical Corp.,* 298 F.Supp. 373 (D.Md.1969), the United States District Court for the District of Maryland, after addressing the question of jurisdiction as to the corporate defendants, also held that there was jurisdiction with respect to the attorneys:

> The foregoing findings are also true with respect to the fees paid to Cohn's law firm. **Although the legal services may have been rendered in New York,** they were used in Maryland. Cohn's affidavit, like those of the other individual defendants, is very cautiously worded and does not deny that **he rendered services which were used in Maryland.**

*Id.* at 378 (emphasis added).

Messerman wrote to his client in Maryland, informing him that his probation had terminated and asking his client to remind him two years later to file for expungement. Messerman wrote to his client, or told him over the phone, that the juvenile court records would be expunged; that they had been expunged; that under Ohio law, it was as if the matters described in those records had never occurred; and that appellant need not worry about those records any more.

Messerman has not denied making those communications to appellant in Maryland.

In this State, practicing law means, among other things, "giving legal advice." Md.Code (2004 Repl.Vol.), Bus. Occ. & Prof. § 10–101(h). Messerman wrote to his client at his client's Maryland residence, and, arguably, in furtherance of their attorney-client relationship, rendered legal advice that the client now asserts constituted legal malpractice. Although it would appear that Messerman's conduct brought him within the purview of § 6–103(b)(1), we decline to reach the issue. We shall, instead, turn to the question of whether exercising jurisdiction on these facts comports with the Due Process clause. The nature and extent of the minimum contacts with the State of the Maryland, therefore, will inform our disposition of the existence of *in personam* jurisdiction, *vel non.*

## B

■ Similar to the two-step analysis referred to above, step two, the due process analysis, itself involves a two-step evaluation. First, we must inquire whether Messerman "purposefully established minimum contacts" with Maryland, and if he did, then we must decide "whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *see also* Lynch, *supra,* § 3.3(b)(2)(a) at 3–29 to 3–30. Although lengthy, the *Burger King* Court's opinion provides a thorough summary of the constitutional standards, which we quote liberally:

The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. By requiring that individuals have fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign, the Due Process Clause gives a degree of predictability to the legal system that

allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning" requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. " 'Specific' jurisdiction contrasts with 'general' jurisdiction, pursuant to which a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum." Thus [t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State and those products subsequently injure forum consumers. Similarly, a publisher who distributes magazines in a distant State may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story. And with respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.

We have noted several reasons why a forum legitimately may exercise personal jurisdiction over a nonresident who "purposefully directs" his activities toward forum residents. A State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Moreover, where individuals purposefully derive benefit from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid inter-

state obligations that have been involuntarily assumed. And because modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.

Notwithstanding these considerations, the constitutional touchstone remains whether the defendant purposefully established minimum contacts in the forum State. Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a sufficient benchmark for exercising personal jurisdiction. Instead, the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. In defining when it is that a potential defendant should reasonably anticipate out-of-state litigation, the Court frequently has drawn from the reasoning of *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958):

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that

create a substantial connection with the forum State. Thus where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in the forum as well.

Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. *Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are purposefully directed toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.*

471 U.S. at 471–76, 105 S.Ct. 2174 (citations and quotation marks omitted and emphasis added). As we shall explain, Messerman's conduct falls short of those standards because Messerman did not purposefully avail himself of this jurisdiction. Rather, any contacts with Maryland result from appellant's unilateral activities reaching out of Maryland.

■ Appellant seeks to have our courts assert *specific* personal jurisdiction over Messerman based on § 6–103(b)(1) of the Courts and Judicial Proceedings Article. Consequently, Messerman can only be sued in Maryland for a cause of action arising from any act enumerated in § 6–103. The fact that Messerman referred his client to Sheppard Pratt has no bearing as to the jurisdictional issue because that referral is in no way connected to Bond's cause of action against Messerman.

The acts of Messerman, relevant to the cause of action at issue, are:

1.   Shortly after December 4, 1985, appellant called Messerman, in Ohio, and was told by Messerman that his Ohio juvenile record would be expunged.

2.   In January 1986, Messerman mailed a letter to Maryland, which was addressed to appellant, asking appellant to remind him in two years to file for an expungement of appellant's juvenile record.

3.   Appellant, in 1986, phoned Messerman in Ohio and told him that he ought to file the petition for expungement without a reminder.   Messerman orally agreed to do so.

4.   Appellant wrote to Messerman in Ohio in 1994, which was after he had filed for at least one gun permit, asking for a copy of the transcript showing that his juvenile record had been expunged or, in the alternative, asking (that if the record had not been expunged) to now have it expunged.

5.   On May 16, 1994, Messerman responded to appellant's May 12, 1999, missive with a letter to appellant in Maryland. In that letter he told appellant that there was no Ohio procedure for expunging a juvenile record but that he need not worry about the lack of expungement because the records were "private, confidential and sealed."

6.   On June 2, 1994, appellant wrote to Messerman in Ohio, questioning his statement that the juvenile records were "automatically expunged."

7.   Also in June 1994, appellant followed up on his June 2 letter by phoning Messerman in Ohio. In that phone conversation, Messerman reiterated that the Ohio juvenile record had been expunged, and as a consequence, appellant had "nothing to worry about."

Of the seven relevant contacts Messerman had with appellant, five were contacts made by appellant—either by letter or phone—to Messerman in Ohio. In *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. 1228, the Supreme Court said:

The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement

of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

Because Messerman's contacts with Maryland exist only by virtue of the unilateral conduct of his client, we hold that requiring Messerman to defend appellant's suit in Maryland would offend traditional notions of fair play and substantial justice.

## II

Appellant sued Sheppard Pratt for allegedly disclosing his medical records in violation of Md.Code (2000 Repl.Vol.), Health–Gen. (H.G.), § 4–302(a): "A health care provider shall: (1) Keep the medical record of a patient or recipient confidential; and (2) Disclose the medical record only" as permitted by law. The trial court granted summary judgment on appellant's negligence claim against Sheppard Pratt, reasoning that, as a matter of law, the hospital's disclosure of appellant's records was made in good faith, for which it therefore cannot be held liable under H.G. § 4–308: "A health care provider, who in good faith discloses or does not disclose a medical record, is not liable in any cause of action arising from the disclosure or nondisclosure of the medical record."

Appellant argues that the parties genuinely disputed the material fact of whether Sheppard Pratt's actions were in good faith. Therefore, posits appellant, summary judgment was inappropriate. Sheppard Pratt's response is that:

In accordance with H.G. § 4–309(f), a health provider is answerable to an aggrieved party who claims a violation of the Act or any of its provisions, if the aggrieved party can demonstrate that the health care provider "knowingly" violated the act and caused the actual damages. Those elements make up the civil remedy, and that civil remedy is deemed exclusively by Maryland law.

H.G. § 4–309(f) provides: "A health care provider or any other person who *knowingly violates* any provision of this subtitle is liable for actual damages." (Emphasis added.) This argument, i.e., that appellant's "negligent disclosure" allegations failed to state a claim upon which relief could be granted, did not form the basis for the trial court's grant of summary judgment, and we may not affirm on this basis. *See Davis v. DiPino,* 337 Md. 642, 655 A.2d 401 (1995).[6]

We have previously observed, in another context: "A question of good faith 'almost always' presents an issue of fact for trial." *Laws v. Thompson,* 78 Md.App. 665, 677, 554 A.2d 1264 (1989) (quoting *Freed v. Worcester County Dep't of Soc. Servs.,* 69 Md.App. 447, 456, 518 A.2d 159 (1986)). The term "good faith" in H.G. § 4–308 has not been interpreted in any reported Maryland case, and the term is not defined in the Statute. In such situations, "under the rules of statutory construction, it should be given its plain and ordinary meaning." *Catterton v. Coale,* 84 Md.App. 337, 342, 579 A.2d 781 (1990). In *Catterton,* Coale had reported appellant's suspected child abuse; Catterton's suit against Coale, alleging negligence, among other theories, was dismissed on the basis that Coale's report was made in good faith. We went on to explain:

"Good-faith" is an intangible and abstract quality that encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage. *Black's Law Dictionary* 623 (5th ed.1979). To further illuminate the definition of "good-faith," we found it most instructive to compare the definition of "bad-faith." "Bad-faith" is the opposite of good

---

**6.** *But see* H.G. § 4–309(a) (prohibiting health care providers from "knowingly refus[ing] to disclose a medical record" when required); *Davis v. Johns Hopkins Hosp.,* 330 Md. 53, 73–74, 622 A.2d 128 (1993) (holding that, under § 4–309(a), "knowingly refus[ing] to disclose" "proscribes intentional, as opposed to negligent ... conduct"); *cf.* H.G. § 4–309(f) (only imposing liability for actual damages for "knowing" violations). Appellant cast his Count V as a claim that Sheppard Pratt negligently violated H.G. § 4–302(a), but the cited authorities strongly suggest that no relief can be granted upon such a claim.

faith; it is not simply bad judgment or negligence, but it implies a dishonest purpose or some moral obliquity and a conscious doing of wrong. Though an indefinite term, "bad-faith" differs from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design. Thus, we would infer that the definition of "good-faith" under § 5–708 means with an honest intention. *See Laws v. Thompson,* 78 Md.App. 665, 678, 554 A.2d 1264 (1989).

Appellant complains that Coale was negligent in the manner in which she conducted the child abuse investigation against him. The fact that Coale may have been negligent in the performance of her duties as relating to the investigation of appellant does not mean that she did not act in "good-faith."

*Id.* at 342–43, 579 A.2d 781 (citations omitted); *see also Rite Aid Corp. v. Hagley,* 374 Md. 665, 680–81, 686–87, 824 A.2d 107 (2003).

■ Appellant first argues that the good faith of Sheppard Pratt's Records Custodian is dubious (and therefore an inappropriate matter for summary judgment) because she disclosed *mental* health records, while the records request only mentions *"medical* records." This is a non-issue. The relevant statute, H.G. § 4–301(g)(1)(iii) defines "medical record" as "any oral, written or other transmission in any form or medium of information that: ... (iii) Relates to the health care of the patient or recipient." The term "health care" is defined as meaning "any care, treatment, or procedure by a health care provider: (1) To diagnose, evaluate, rehabilitate, manage, treat, or maintain the physical *or mental condition* of a patient or recipient.", H.G. § 4–301(f)(1) (emphasis added). Thus, medical records encompass mental health records, and the Records Custodian did not err in assuming that to be the case.

■ Appellant also points out, "At the time, [Sheppard Pratt's] policy was *not* to release records in response to a subpoena without a certificate or a release from the patient

himself." [7] We have quoted the relevant portions of Sheppard Pratt's records policy above, at p. 14. Appellant's argument fails to view the facts as seen from the perspective of the Records Custodian when she received the request: she received a document, signed by a judge, captioned "STATE VS. SPECIAL INVESTIGATION," ordering her to deliver appellant's records to the State's Attorney's Office within five days for use in a grand jury proceeding, and she was ordered not to disclose the existence of the request. The Records Custodian complied with those portions of Sheppard Pratt's policy for answering court orders for records in criminal cases.

From the Records Custodian's perspective at the time she received the request, releasing the records was proper under H.G. § 4–306(b)(7):

> (b) A health care provider shall disclose a medical record without the authorization of a person in interest:
>
> . . . .
>
> Subject to the additional limitations for a medical record developed primarily in connection with the provision of mental health services in § 4–307 of this subtitle, to grand juries, prosecution agencies, law enforcement agencies or their agents or employees to further an investigation or prosecution, pursuant to a subpoena, warrant, or court order for the sole purposes of investigating and prosecuting criminal activity, provided that the prosecution agencies and law enforcement agencies have written procedures to protect the confidentiality of the records.

Appellant has not directed our attention to any provision in H.G. § 4–307 that would have precluded disclosure under § 4–306(b)(7); neither has appellant, more broadly, shown any genuine dispute of material fact precluding summary judgment on Sheppard Pratt's good faith. Given the record in this unique set of circumstances, the only reasonable conclusion to

---

7. The certificate or release provisions appear in H.G. §§ 4–306(b)(6) and 4–307(k)(1)(v).

be drawn is that the Records Custodian did not act in bad faith in complying with the irregular subpoena.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**