895 A.2d 990

**William C. BOND**

v.

**Gerald A. MESSERMAN, et al.**

No. 48, Sept. Term, 2005.

Court of Appeals of Maryland.

April 7, 2006.

Timothy M. Gunnin (Law Offices of Timothy M. Gunning, LLC, Towson, Richard M. Karceski, Law Offices of Richard M. Karceski, Towson, on brief), for petitioner.

Irwin R. Kramer (Kramer & Connolly, Owings Mills, on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

This particular case began when William C. Bond (Petitioner) filed suit against Gerald A. Messerman (Respondent), an attorney admitted to practice law in Ohio, on 4 February 2003

in the Circuit Court for Baltimore City, alleging professional malpractice, negligent misrepresentation, breach of fiduciary duty, and constructive fraud stemming from legal representation undertaken, and advice given, by Messerman to Bond by letter and telephone conversation regarding the expungement of Bond's Ohio juvenile records and the failure to expunge those records. The Circuit Court's dismissal of the suit, and the Court of Special Appeals's affirmance of that judgment, reaches us because we granted Bond's writ of certiorari to consider:

1. Whether a lawyer, or other professional, has transacted business or performed a service in Maryland under Courts and Judicial Proceedings, § 6–103(b)(1) [1] for purposes of establishing personal jurisdiction when the lawyer, never physically present in Maryland, provides negligent professional advice by mail and telephone to a person the lawyer knows resides in Maryland and will rely upon the negligent professional advice in Maryland;

2. Whether a lawyer, or other professional, "causes tortious injury in the State by an act or omission in the State" under Courts and Judicial Proceedings, § 6–103(b)(3) [2] when the lawyer provides negligent professional advice by mail or telephone, never physically entering Maryland, to a person he knows resides in Maryland and who will rely upon the negligent advice in Maryland; and

3. Whether communicating negligent legal advice into Maryland is a sufficient minimum contact to establish

---

**1.** Section 6–103(b)(1) of our long-arm statute provides that a court may exercise personal jurisdiction over a person, who directly or by an agent "[t]ransacts any business or performs any character of work or service in the State." Maryland Code (1973, 2002 Repl.Vol.), Courts and Judicial Proceedings Article, § 6–103(b)(1). Unless otherwise provided, all statutory references are to § 6–103.

**2.** Section 6–103(b)(3) provides that a court may exercise personal jurisdiction over a person, who directly, or by an agent "[c]auses tortious injury in the State by an act or omission in the State." § 6–103(b)(3).

personal jurisdiction under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

*Bond v. Messerman,* 388 Md. 404, 879 A.2d 1086 (2005).

## I.

The Court of Special Appeals stated succinctly the relevant facts in its reported opinion in the present case, 162 Md.App. 93, 873 A.2d 417 (2005):

On June 19, 1981, in the garage of his grandparents' home in Chagrin Falls, Ohio, little more than seven months before his eighteenth birthday, [Bond] bludgeoned his father to death with a hammer. After murdering his father, [Bond] stuffed the body into the trunk of his father's car, drove it to an isolated location, and left the car there. A warrant for [Bond]'s arrest was issued three days later.

Messerman, an Ohio attorney, was retained to represent [Bond]. On July 1, 1981, Judge Frank G. Lavrich, of the Juvenile Division of the Geauga County, Ohio Common Pleas Court, heard sufficient evidence "tending to show that there is reason to believe that William Rovtar [3] did commit the offense as charged in the complaint and that said act would constitute a felony if committed by an adult." The judge ordered that [Bond] be held at the Geauga Juvenile Center and undergo psychological testing.

\*     \*     \*

On August 31, 1981, based on an agreement Messerman negotiated with the prosecutor, Judge Lavrich agreed to retain jurisdiction in the Juvenile Division, and he accepted [Bond]'s guilty plea to his father's murder. Part of the plea agreement included [Bond]'s commitment to a psychiatrist hospital, and Messerman located and recommended Sheppard Pratt, in Baltimore County, Maryland, as a suitable

---

3. The intermediate appellate court noted that Bond "was born William Crockett Rovtar, but changed his name after the events described here."

hospital. [Bond] alleges that he and Messerman "discussed the concept of expungement in 1981, prior to the proffer of the delinquent plea . . ., its legal effects under Ohio law and the importance to [Bond] of being able to expunge his juvenile record."

The juvenile court's order described the disposition preliminarily imposed:

[Bond] was committed to the permanent custody of the Ohio Youth Commission. . . . Execution of the commitment [sic] was suspended pending an evaluation of 60 day duration at a Mental Health facility, the Pratt Shephard Hospital [sic] regarding the suitability and feasability of said [Bond] being committed to such facility for treatment, care and counseling. Said hospital to submit to the Court a report accepting said juvenile as a suitable patient along with a diagnosis, prognosis, program of treatment and care and the projected duration of such program.

\*　\*　\*

In fulfillment of the juvenile court's order, after [Bond] spent approximately sixty days at Sheppard Pratt, Judge Lavrich received [a] report from Kay Pak Koller, M.D., a psychiatrist at the hospital. [The report stated that Bond was responding to the therapeutic approach and that his prognosis appeared to be good.]

\*　\*　\*

On September 13, 1982, after another hearing, the juvenile court placed [Bond] on probation until his twenty-first birthday, requiring him to continue his outpatient treatment with Sheppard Pratt. After [Bond] turned twenty-one, the court terminated his probation on February 22, 1985. Later that year, around December 4, 1985, [Bond] received a letter from his probation officer confirming that his probation had terminated, and explaining that [Bond] could "file an application, available from this Court, for the expungement of [Bond's] juvenile record two years from this action." In 1985, Messerman allegedly told [Bond during a telephone

call placed by Bond to Messerman] that his "juvenile record would be expunged" and that [Bond] "would never have to admit to the existence of the juvenile case once the record was expunged."

[Bond] alleges that he called Messerman shortly after receiving the probation officer's letter, reminding Messerman of his desire to have his juvenile records expunged. In a letter of January 17, 1986, addressed to [Bond] at his St. Paul Street address in Baltimore City, and printed on "Messerman & Messerman" law firm stationery, Messerman asked, "Please remind me in two years to file an application for expungement and I will do so." [Bond] called Messerman soon thereafter, saying that because Messerman had been paid $25,000 to represent [Bond],[footnote states: [Bond] does not contend that he paid Messerman] Messerman ought to file for expungement without the necessity of a reminder. Messerman agreed.

Eight years later, [Bond] wrote to Messerman on May 12, 1994:

Dear Gerry,

Its [sic] been quite a while since you've heard from me. I've been back and forth between Baltimore and Jamaica working as a tennis pro. In the mean time [sic], I've been working very hard to develop myself as a human being and as a writer. It looks like my diligence is about to pay off. I've been signed by an L.A. entertainment agency to market the literary and dramatic rights to my book tentatively titled SELF–PORTRAIT of a PATRICIDE. If I can believe what I'm being told my writing will be received as literature and will make a positive social statement.

Presently, I am on a 45 day revision deadline and there are a few documents that I need from you. . . .

1) I need transcripts of the sentencing.

2) I am missing any records indicating that my juvenile record was expunged. Was it? If it was I need a record of it. If it wasn't can we have it expunged now?

Soon thereafter, on May 16, 1994, Messerman wrote back to [Bond] at his Cockeysville, Maryland address, this time on the stationary of "Duvin, Cahn, Barnard & Messerman":

Dear Bill:

I am glad to hear that you are healthy and creative.

I would be delighted to review your book. Is it finished? I don't have transcripts of your sentencing. We never ordered any transcripts. I know of none currently available.

There is no procedure for expunging your juvenile record. It is automatically "expunged" in the sense that it is private, confidential and sealed. It is not a criminal record. You don't have to worry about it.

In a June 2, 1994 letter, [Bond] responded:

Dear Gerry,

Thank you for your quick response to my letter. I am enclosing two letters, one from the court dated 12/5/85 and one from you dated 1/86. If, as you say in your recent letter, that my record is automatically expunged then why is a reference made in both of the enclosed letters to filing for expungement? Also, if I on my own volition make my case public then does that give the court implied permission to make my entire record public based on some kind of public domain theory?

I am currently revising my book. My agent is planning to auction it to publishers either at the end of June or early July. I will send you a revised copy as soon as my revisions are complete.

[Bond] called Messerman around that same date. During their conversation, Messerman reiterated that the juvenile records were expunged, and again advised [Bond] that he "would never have to admit to the existence of the juvenile case" and assured [Bond] that he "had nothing to worry about."

In the fall of 1993, [Bond] bought a .38 caliber Smith & Wesson revolver from a gun shop on Harford Road, in Baltimore County. In the spring of 1994,[Bond] bought a

Glock 9mm handgun from the same dealer.[4]   Later that year, [in the autumn of 1994, Bond] bought a second Glock 9mm and, in the winter of 1994–1995, [Bond] bought a Beretta .25 caliber pistol;  both of those weapons were purchased from a gun shop on Falls Road, just north of Baltimore City.[Bond also completed an application to purchase a .38 caliber Smith & Wesson handgun in the summer of 2001.]   In each of the firearm purchase applications, [Bond] certified that he had never spent more than thirty consecutive days in a medical institution for treatment of a mental disorder.   *See* Md.Code (2003 Repl.Vol., 2004 Supp.), Public Safety § 5–118(b)(3)(vii) (previously codified at Art. 27 § 442).

[Bond], of course, had spent more than thirty days in such an institution.   His affidavit explains:

> I entered "no" when asked whether I had ever been committed to a mental institution on each of the applications to purchase handguns because Mr. Messerman had told me several times in writing and on the telephone that my juvenile records would be and/or had been expunged and that therefore the matters contained in the records were "deemed never to have occurred" and that I would never had to admit to the existence of the juvenile case.

(Some alterations in original).

*Bond,* 162 Md.App. at 97–103, 873 A.2d at 419–23.

A series of equally unfortunate events unfolded over the next several years, see *Bond v. Slavin,* 157 Md.App. 340, 851 A.2d 598 (2004), and *Bond v. Blum,* 317 F.3d 385, 390–91 (4th Cir.2003).   Because those events are of little relevance to the question of specific personal jurisdiction presented here, we need not describe them in detail.   Suffice it to state that a copy of the manuscript and Bond's Ohio juvenile court records came into the possession of the Maryland State Police, who,

---

4.   Bond was not prosecuted for these two gun purchases because the applicable statute of limitations had expired.

thereafter, learned of Bond's handgun purchases and his mendacities in answering on the four gun permit applications that he had not been institutionalized for more than thirty days. As a result of obtaining this information, the State Police procured a warrant for Bond and arrested him on 25 May 2001. *Bond,* 162 Md.App. at 107, 873 A.2d at 426. As the Court of Special Appeals explained in its opinion:

> The State's Attorney for Baltimore City charged [Bond] with illegally possessing eight handguns and, in the Circuit Court for Howard County, the Attorney General's Office charged [Bond] with two counts of providing false information on his handgun purchase applications.[5]  On or about July 20, 2001, Sheppard Pratt received a subpoena requiring the hospital to provide to the State's Attorney's Office "all certified medical records pertaining to" [Bond's] inpatient treatment.  In response, records custodians at Sheppard Pratt sent copies of all their records on [Bond]—both medical records and mental health records—to the State's Attorney's Office.[6]

> \*     \*     \*

> Neither of the firearms prosecutions resulted in a conviction.  The Baltimore City case was dismissed, and in Howard County, by the parties' stipulation, the case was placed on the "stet" docket on condition that [Bond] forfeit his

---

**5.**  We note the discrepancy between the number of applications to purchase a handgun (five), the number of handguns that Bond possessed when charged with illegal possession (eight), and the number of counts of providing false information on a handgun application (two). The resolution of these discrepancies, however, is not necessary to decide whether Maryland courts may exercise personal jurisdiction over Messerman.

**6.**  Bond also asserted a cause of action against Sheppard Pratt for allegedly disclosing his medical records in violation of Maryland Code (1982, 2000 Repl.Vol.), Health–General Article, § 4–302(a).  The Circuit Court granted Sheppard Pratt's motion for summary judgment. Bond appealed and the intermediate appellate court affirmed the Circuit Court's judgment.  Bond has not pursued to this Court a further challenge to the judgment to dismiss the action against Sheppard Pratt.

firearms to the State and not possess any other guns for one year.

*Bond,* 162 Md.App. at 107, 873 A.2d at 425.

As noted at the beginning of our opinion, Bond filed suit against Messerman on 4 February 2003 in the Circuit Court for Baltimore City alleging legal malpractice, negligent misrepresentation, breach of fiduciary duty, and constructive fraud because Messerman failed to expunge Bond's Ohio juvenile records and gave assertedly incorrect legal advice by telephone and letter. On 11 April 2003, Messerman filed a motion to dismiss for lack of personal jurisdiction. After conducting a hearing on the motion, the trial judge entered a written Order on 20 May 2003 granting Messerman's motion and dismissing the case. Bond appealed to the Court of Special Appeals, which affirmed the Circuit Court's judgment.

The intermediate appellate court concluded that "[a]lthough it would appear that Messerman's conduct brought him within the purview of § 6–103(b)(1)," the court turned "to the question of whether exercising jurisdiction on these facts comports with the Due Process clause." *Bond,* 162 Md.App. at 113, 873 A.2d at 428. Quoting from *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Court of Special Appeals noted that, rather than focusing on the foreseeability of causing injury in the forum State by one's actions outside the forum State, the "foreseeability that is critical to due process analysis [ ] is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court [in the forum State]." *Bond,* 162 Md.App. at 113, 873 A.2d at 429. The panel of the court observed that, of Messerman's relevant seven contacts with Maryland alleged in the cause of action, only two were initiated by Messerman: the two letters written by him. *Bond,* 162 Md.App. at 117, 873 A.2d at 431. The other five contacts were initiated by Bond from Maryland, either by telephone or letter. *Id.* "Because Messerman's contacts with Maryland exist[ed] only by virtue of the unilateral conduct of his client," the court concluded that "requiring Messerman to defend [Bond's] suit in Maryland would offend

traditional notions of fair play and substantial justice." *Bond,* 162 Md.App. at 118, 873 A.2d at 431. The two contacts by letter initiated by Messerman, the court determined, were not sufficient to satisfy the minimum required by Due Process. *Id.*

## III.

The Circuit Court granted Messerman's Motion to Dismiss for Lack of Personal Jurisdiction. A motion to dismiss for lack of personal jurisdiction is made pursuant to Md. Rule 322(a), which provides:

> (a) **Mandatory.** The following defenses shall be made by motion to dismiss filed before the answer, if an answer is required: (1) lack of jurisdiction over the person.... If not so made and the answer is filed, these defenses are waived.

The defense of lack of personal jurisdiction ordinarily is collateral to the merits and raises questions of law. *Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC,* 388 Md. 1, 11–12, 878 A.2d 567, 573–74 (2005) (citing JUDGE PAUL V. NEIMEYER AND LINDA SHUETT, MARYLAND RULES COMMENTARY 205 (3d ed.2003)). If additional facts are necessary to decide the motion to dismiss for lack of personal jurisdiction, the court may consider affidavits or other evidence adduced during an evidentiary hearing, without transforming the motion to dismiss into a motion for summary judgment. *Beyond Systems, Inc.,* 388 Md. at 12 n. 10, 878 A.2d at 574 n. 10 ("This [standard of review] contrasts with the effect of the trial court's consideration of matters outside the pleadings on a motion to dismiss for failure to state a claim upon which relief may be granted under Maryland Rule 2–322(b)"); NEIMEYER, *supra,* at 205.

The applicable standard of appellate review of the grant of a motion to dismiss for lack of personal jurisdiction is whether the trial court was legally correct in its decision to dismiss the action against Messerman. *See Beyond Systems, Inc.,* 388 Md. at 12–29, 878 A.2d at 574–84 (considering the evidence presented to the trial court regarding minimum

contacts of the defendant company with Maryland and concluding that the trial court properly determined that the plaintiff had failed to establish a *prima facie* case for personal jurisdiction over the defendants); *Jason Pharmaceuticals, Inc. v. Jianas Bros. Packaging Co., Inc.*, 94 Md.App. 425, 431–34, 617 A.2d 1125, 1128–30 (1993) (considering the evidence relevant to a determination of whether the defendant business had transacted business in Maryland under § 6–103(b)(1) of the long-arm statute and holding that the trial court erred when it concluded that the plaintiff had not transacted business in Maryland by negotiating and entering into one contract for sale with a Maryland company).

## IV.

Bond argues that Messerman's conduct satisfied two sections of Maryland's Long Arm Statute. First, Bond argues that Messerman directly transacted business in Maryland by providing negligent legal advice by use of telephone communications and correspondence mailed to a Maryland resident, citing § 6–103(b)(1). Second, Bond maintains that Messerman caused tortious injury to him in Maryland by failing to expunge his Ohio juvenile court records and rendering incorrect legal advice and negligent misrepresentations to Bond by the same telephone calls and letters, causing harm to a Maryland resident, citing § 6–103(b)(3).[7]

---

**7.** Bond also argued in his Brief (although he did not present this argument in his Petition for Writ of Certiorari), in the alternative, were we to conclude that Messerman's misrepresentations were acts that occurred in Ohio, not Maryland, personal jurisdiction under § 6–103(b)(4) is established nonetheless in two "distinct" ways: "(1) Messerman '[caused] tortious injury in the State or outside of the State by an act or omission outside of the State' ... and he ... '[derived]' substantial revenue from ... services ... used or consumed in the State;' ... and (2) because he '[caused]' tortious injury in the State or outside of the State by an act or omission outside the State ... [while] he engage[d] in any other persistent course of conduct in the State" because Messerman persistently communicated over several years with a resident from Maryland, failed to obtain expungement of Bond's juvenile record in Ohio as he was retained and promised to do, and gave incorrect legal advice regarding the effect of the juvenile case

■ Bond asserts that exercising personal jurisdiction over Messerman would satisfy Due Process requirements of fair play and substantial justice because Messerman's alleged negligent representations about expungement of Bond's juvenile records "created a 'substantial connection' to Maryland, and the 'effects' of Messerman's contacts were such that he should reasonably anticipate being haled into Maryland courts to answer for the harm he caused here." The Court of Special Appeals, he claims, focused incorrectly on the fact that Bond initiated nearly all of Messerman's contacts with Maryland, rather than emphasizing Messerman's contacts with Bond and Messerman's knowledge that Bond resided in Maryland when the advice was dispensed. Messerman, therefore, should have foreseen that any injury caused by his alleged malpractice would be felt in Maryland. The harm caused in Maryland through the alleged malpractice was the prosecution and jailing of Bond for lying on his gun permit applications. Bond also notes his interest in obtaining convenient and effective relief in his current home state, as well as the interstate interest in furthering the social policies of Maryland tort and professional liability law, weigh in favor of asserting personal jurisdiction over Messerman.

Messerman retorts that the trial court properly dismissed the suit because Bond failed to allege any, let alone sufficient, contacts between Messerman and the State of Maryland relative to the cause of action pleaded against him. Messerman contends that he conducted all of his representation of Bond in Ohio and it was only because of "courtesy" to a former client that he responded to Bond's communications from Maryland and thereby did not avail himself purposefully of the benefits and protections of doing business in Maryland. Moreover, Bond neither retained Messerman to represent him in Maryland, nor consulted with him on any aspect of Maryland law, nor paid him for practicing law in Maryland. Messerman

---

proceedings. Because we conclude, *infra*, that to exercise personal jurisdiction over Messerman would violate Due Process requirements, we do not need to resolve whether Messerman's conduct otherwise satisfies § 6–103(b)(4) of our long-arm statute.

argues that none of his contacts with Maryland satisfy our long-arm statute or the Due Process Clause of the Federal Constitution because his contacts with the State are too tenuous and not substantial enough to satisfy minimum contacts requirements. Relying on *Burger King Corp.*, Messerman posits that foreseeability of causing injury in another State is not a "sufficient benchmark" for exercising personal jurisdiction. Thus, he contends, to exercise personal jurisdiction over him would offend traditional notions of fair play and substantial justice and is prohibited.

## V.

We conclude that for a Maryland court to exercise personal jurisdiction over Messerman based upon the well-pleaded facts set forth in the pleading and papers in the present case would violate Due Process requirements, and hence, the long-arm statute of Maryland can not be satisfied. Determining whether a Maryland court may exercise personal jurisdiction over a foreign defendant requires a two-step analysis. "First, the requirements under the long-arm statute must be satisfied, and second, the exercise of jurisdiction must comport with due process." *Mackey v. Compass Marketing, Inc.*, 391 Md. 117, 129–30, 892 A.2d 479, 486 (2006). We have construed our long-arm statute to authorize the exercise of personal jurisdiction to the full extent allowable under the Due Process Clause. *See, e.g., id.; Beyond Systems, Inc.*, 388 Md. at 14–15, 878 A.2d at 576; *Geelhoed v. Jensen*, 277 Md. 220, 224, 352 A.2d 818, 821 (1976) (Citations omitted); *see also Stover v. O'Connell Associates, Inc.*, 84 F.3d 132, 135 (4th Cir.1996). Thus, if to exercise specific jurisdiction in a given case would violate Due Process, we construe our long-arm statute as not authorizing the exercise of personal jurisdiction over the defendant. *See Mackey*, 391 Md. at 130, 892 A.2d at 486–87 (stating that "if the conspiracy theory [of specific personal jurisdiction] were inconsistent with due process, that inconsistency would require us to reject the conspiracy theory as an interpretation of the long-arm statute ... [;] we interpret the long-arm statute in light of the intent of the General

Assembly to extend personal jurisdiction to the limits permitted by the Due Process Clause").

■ We need not resolve whether Messerman's alleged dispensing of legal advice by telephone and letter to Bond satisfies the statutory requirements of §§ 6–103(b)(1) and (3) of the long-arm statute because, even assuming it did, we conclude, *infra*, that Messerman lacks minimum contacts with the State of Maryland—thus, our negative response to the third Question Presented, *supra*, is dispositive of this case.[8]

■ To comply with the Due Process Clause of the Fourteenth Amendment, the exercise of personal jurisdiction over an out-of-state defendant requires that the defendant have established minimum contacts with the forum state and that to hale him or her into court in the forum state would comport with traditional notions of fair play and substantial justice. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228,

---

8. We observe, in passing, that Messerman's alleged failure to expunge Bond's juvenile court records in Ohio does not satisfy the long-arm statute because it was not an act committed in Maryland. The commission of legal malpractice by failure to act in another State does not constitute the commission of a tort in Maryland, which is an element required by § 6–103(b)(3). § 6–103(b)(3) (providing that a court may exercise personal jurisdiction over a person who "[c]auses tortious injury in the State by an act or omission in the State"); *Layton v. AAMCO Transmissions, Inc.*, 717 F.Supp. 368, 370 (D.Md.1989) (concluding that the defendant lacked minimum contacts with the State of Maryland where he sent two letters to the plaintiff in Maryland because §§ 6–103(b)(1) and (3) of the long-arm statute require acts to have occurred in the State and so do not allow application of the so-called "effects" test); *Craig v. Gen. Fin. Corp. of Ill.*, 504 F.Supp. 1033, 1036–37 (D.Md.1980) (stating that § 6–103(b)(3) requires an act or omission in the State); *see also Kowalski v. Doherty*, 787 F.2d 7, 9–11 (1st Cir.1986) (concluding that the tort of malpractice allegedly committed by a Massachusetts law firm, representing a New Hampshire client in a wrongful death action, for failing to file the cause of action in Massachusetts before the statute of limitations expired occurred in Massachusetts, notwithstanding that the "effect" of the tort was felt in New Hampshire; although the attorney knew that the client resided in New Hampshire at the time of representation, the acts of malpractice (the failure to act) occurred in Massachusetts and the attorney-client relationship was created in Massachusetts).

1239–40, 2 L.Ed.2d 1283, 1297–98 (1958); *International Shoe Co. v. Washington, Office of Unemployment Compensation & Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980); *Mackey,* 391 Md. at 129–30, 892 A.2d at 486. In determining whether minimum contacts exist, we consider (1) the extent to which the defendant has purposefully availed himself or herself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. *Burger King Corp.,* 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d at 540–41; *Beyond Systems, Inc.,* 388 Md. at 26, 878 A.2d at 582 (Citations omitted); *Presbyterian University Hosp. v. Wilson,* 337 Md. 541, 551–552, 654 A.2d 1324, 1330 (1995) (citing *Camelback Ski Corp. v. Behning (Camelback II),* 312 Md. 330, 336, 539 A.2d 1107, 1110 (1988)).

■■■■■ Under the law of specific jurisdiction, the contacts by the defendant with the forum state relevant to the Due Process analysis are those from which the cause of action arises. Generally, telephone calls and correspondence with the plaintiff in the forum state are not sufficient contact with the forum state to satisfy due process requirements. *Cape v. Maur,* 932 F.Supp. 124, 128 (D.Md.1996) (stating that generally, correspondence and telephone calls are insufficient as a matter of law to establish minimum contacts to satisfy Due Process requirements) (citing *Coating Engineers, Ltd. v. Electric Motor Repair Co.,* 826 F.Supp. 147, 149 (D.Md.1993)); *Leather Masters (PVT), Ltd. v. Giampier,* 836 F.Supp. 328, 331 (D.Md.1993) ("[T]he plaintiff points to the defendant's correspondence, telephone conversations, and telefax communications with plaintiff's agent, which is located in Maryland. However, without more, communications made from outside of the State to a Maryland resident are not enough to justify the exercise of personal jurisdiction over an out-of-state defendant.") (citing *Craig,* 504 F.Supp. at 1038); *Coating Engineers, Ltd.,* 826 F.Supp. at 148–49 (concluding that defendant's

telephone conversations with a party in Maryland and listing in publication with circulation in Maryland do not amount to purposefully seeking contacts in Maryland).

The Court of Special Appeals outlined the acts by Messerman from which the malpractice action against him arose:

1. Shortly after December 4, 1985, [Bond] called Messerman, in Ohio, and was told by Messerman that his Ohio juvenile record would be expunged.

2. In January 1986, Messerman mailed a letter to Maryland, which was addressed to [Bond], asking [Bond] to remind him in two years to file for an expungement of [Bond's] juvenile record.

3. [Bond], in 1986, phoned Messerman in Ohio and told him that he ought to file the petition for expungement without a reminder. Messerman orally agreed to do so.

4. [Bond] wrote to Messerman in Ohio in 1994, which was after he had filed for at least one gun permit, asking for a copy of the transcript showing that his juvenile record had been expunged or, in the alternative, asking (that if the record had not been expunged) to now have it expunged.

5. On May 16, 1994, Messerman responded to [Bond's] May 12, 1999, missive with a letter to [Bond] in Maryland. In that letter he told [Bond] that there was no Ohio procedure for expunging a juvenile record but that he need not worry about the lack of expungement because the records were "private, confidential and sealed."

6. On June 2, 1994, [Bond] wrote to Messerman in Ohio, questioning his statement that the juvenile records were "automatically expunged."

7. Also in June 1994, [Bond] followed up on his June 2 letter by phoning Messerman in Ohio. In that phone conversation, Messerman reiterated that the Ohio juvenile record had been expunged, and as a consequence, [Bond] had "nothing to worry about."

*Bond,* 162 Md.App. at 117, 873 A.2d at 430–31. Against this backdrop, we are mindful also that Messerman maintained no office or agent in Maryland, did not solicit clients or advertise

his services in Maryland, and made no trips to Maryland related to Bond's pleaded cause of action.

Bond argues that because the injury of the alleged malpractice was felt in Maryland, due process considerations are satisfied. We have not resolved previously whether an out-of-state attorney establishes minimum contacts in Maryland: (1) where his or her client relocates to Maryland; (2) the attorney thereafter allegedly gives legal advice by letter and telephone about the law of the now foreign jurisdiction; (3) the attorney knows (or should know) that the client likely would rely on that advice; and (4) the harm caused is experienced in Maryland. The Court of Special Appeals and the U.S. District Court for the District of Maryland have declined to exercise jurisdiction under circumstances analogous to the present case on the basis that Due Process requirements would be violated to do so. *See McGann v. Wilson*, 117 Md.App. 595, 701 A.2d 873 (1997) (holding that where a Virginia attorney allegedly committed malpractice when representing a Maryland plaintiff in worker's compensation proceedings in Virginia, as co-counsel with a Maryland attorney, and the defendant attorney visited Maryland once to have his client and co-counsel sign a settlement check, sufficient minimum contacts to exercise personal jurisdiction were not present); *Cape*, 932 F.Supp. 124 (holding that, in a malpractice action, personal jurisdiction could not be exercised over attorneys of a German law firm representing a Maryland resident because the attorneys did not direct their activities to Maryland, where the subject of representation concerned Board meetings in Germany, and telephone calls and letters to the client in Maryland); *see also Leather Masters*, 836 F.Supp. 328 (concluding that a defendant company based in Colorado did not avail itself purposefully or "transact[ ] business" in Maryland when its only contacts with Maryland that related to the litigation were the return of goods sold to the Maryland agent of the plaintiff company, which was based in Pakistan, solely for the convenience of the plaintiff, and defendant telephoned and sent facsimile and mail correspondence to the plaintiff's Maryland agent regarding the return of the goods); *Coating Engineers*,

*Ltd.*, 826 F.Supp. 147 (holding that the exercise of personal jurisdiction against a California defendant corporation would be unreasonable and unfair, where the relevant contacts between it and the Maryland plaintiff corporation were the negotiation by telephone of a single contract for the sale of goods to be delivered in California, because the plaintiff initiated the first contact without solicitation from the defendant and no agreement for continuing business relations was entered into by the parties).

In *McGann v. Wilson, supra*, 117 Md.App. at 597–98, 701 A.2d at 874, McGann, a Virginia lawyer, was hired as local counsel by two Maryland residents, the Wilsons, through their Maryland counsel, to litigate a tort case with the Maryland lawyer as co-counsel. The third party negligence claim was filed in Fairfax County, Virginia, as a result of an injury sustained in Virginia. *McGann*, 117 Md.App. at 598, 701 A.2d at 874. Throughout the preparation and trial of the case, McGann never visited Maryland. *Id.* McGann's only trip to Maryland in connection with his representation of the Wilsons was for the purpose of obtaining his co-counsel's and clients' signatures on the settlement check after the case settled before the jury could reach a verdict. *McGann*, 117 Md.App. at 599, 701 A.2d at 875. The Wilsons later filed suit in the Circuit Court for Prince George's County, Maryland, against both McGann and the Maryland co-counsel, alleging legal malpractice regarding the settlement and breach of contract regarding the fee arrangement. *McGann*, 117 Md.App. at 600, 701 A.2d at 875. The Wilsons argued that a Maryland court could exercise personal jurisdiction over McGann under § 6–301(b)(1) and (4) of the Maryland long-arm statute. *McGann*, 117 Md.App. at 601, 701 A.2d at 876. The Court of Special Appeals, however, held that McGann was not subject to personal jurisdiction under either § 6–103(b)(1) or (4) of the long-arm statute. *McGann*, 117 Md.App. at 606, 701 A.2d at 878.

The intermediate appellate court concluded that McGann's single trip to Maryland was insufficient to establish minimum contacts with the State of Maryland. *Id.* The court deter-

mined also that McGann did not transact business in Maryland when he represented the Wilsons, or any other unnamed litigants that his Maryland co-counsel might have referred him to in the past. *Id.* Also, the court noted, the alleged acts of negligence and malpractice occurred before McGann ventured to Maryland to have the settlement check signed. "[McGann]'s single foray into Maryland was for the express purpose of having appellees endorse the settlement check received after the case was concluded in Virginia. That single visit is relevant to the jurisdiction issue, but not sufficient to establish jurisdiction over him." *McGann,* 117 Md.App. at 603, 701 A.2d at 877. The court did not mention the "effect of the injury" in its analysis in *McGann.* Instead, the court focused on the defendant attorney's contacts with the forum State.

State appellate and federal trial and appellate courts in jurisdictions possessing long-arm statutes similar to Maryland's long-arm statute differ as to whether an out-of-state attorney, under circumstances similar to those in the present case, should be subject to personal jurisdiction in the forum state. *Compare Sher v. Johnson,* 911 F.2d 1357 (9th Cir.1990) (concluding that the contacts of defendant Florida attorneys with California from which a malpractice action arose did not establish a substantial enough connection to California where the contacts consisted of telephone calls, correspondence, and three visits to California to visit the client and where the attorneys took no action to promote business with California, but exercising personal jurisdiction over the attorneys' partnership because it availed itself of the laws of California by taking, as security for payment of its fee, the deed of trust to the residential home of the California client); *Austad Co. v. Pennie & Edmonds,* 823 F.2d 223 (8th Cir.1987) (concluding that South Dakota courts could not assert personal jurisdiction against a New York law firm in a malpractice action where defendant firm represented a South Dakota company in patent litigation proceedings that occurred in Maryland, and, where the firm did not solicit clients, advertise, or maintain an office in South Dakota, because the firm's contacts with South

Dakota, which consisted of a three-day visit and multiple telephone calls, correspondence, and billing directed to the South Dakota client, did not amount to a substantial enough connection to South Dakota and no showing of purposeful availment was demonstrated); *Kowalski*, 787 F.2d 7 (holding that an out-of-state attorney representing a client residing in New Hampshire in a wrongful death action in Massachusetts was not subject to personal jurisdiction, notwithstanding that the "effect" of the tort was felt in New Hampshire and that the attorney knew that the client resided in New Hampshire at the time of representation, because the acts of malpractice occurred in Massachusetts and the attorney-client relationship was created in Massachusetts); *Mayes v. Leipziger*, 674 F.2d 178 (2d Cir.1982) (concluding that minimum contacts to justify exercising personal jurisdiction in New York over a California attorney were not established where the California attorney represented a New York client with New York co-counsel, where the attorney made telephone calls and sent correspondence to the client and co-counsel in New York regarding representation of the client in California proceedings, and where the attorney kept no office and did not advertise or solicit clients in New York) *with Streber v. Hunter*, 221 F.3d 701 (5th Cir.2000) (holding that personal jurisdiction in Texas was established where an attorney in Louisiana gave allegedly negligent advice in person at his Louisiana office to clients who resided in Texas regarding various tax laws because the attorney "purposely availed himself of Texas law when he gave tax advice that he knew would be received by a Texas client," thus establishing minimum contacts, and noting that most of the malpractice occurred during a mediation that took place in Texas, so that traditional notions of fair play and substantial justice were satisfied); *Jenner & Block v. District Court*, 197 Colo. 184, 590 P.2d 964 (1979) (exercising personal jurisdiction in a malpractice action over Illinois attorneys who represented a Colorado corporation because, although the actions constituting the alleged malpractice occurred in Illinois, the resultant injury occurred in Colorado and the court deemed the tort committed in Colorado, thus satisfying the *prima facie*

showing of threshold jurisdiction under Colorado law); *McGee v. Riekhof*, 442 F.Supp. 1276 (D.Mont.1978) (finding sufficient contacts to establish personal jurisdiction where a doctor in Utah diagnosed a post-surgical patient over the telephone who resided in Montana, when that doctor previously had operated on the patient in Utah, because the professional service of the new diagnosis by means of a telephone call was deemed rendered in Montana).[9]

---

9.  Bond offered several cases decided by courts in other jurisdictions supposedly supporting his argument that asserting personal jurisdiction over Messerman would satisfy the Maryland long-arm statute and comport with Due Process. We find the facts and circumstances of each of these cases distinguishable from the present case.

In *Klump v. Duffus*, 71 F.3d 1368 (7th Cir.1995), the court held that a North Carolina attorney hired by a resident of Illinois to file a tort action in Illinois and who negligently failed to do so could be haled into court in Illinois because he personally availed himself of the privileges of conducting business in Illinois by both his frequent telephonic and written interaction with Illinois residents and by the subject of the representation that involved exclusively Illinois parties, law, and venue. In *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253 (11th Cir.1996), the court held that two out-of-state attorneys accused of malpractice had sufficient contacts with Texas to establish personal jurisdiction where the attorneys agreed to draft a will and trust, under federal and Florida law, of a former client, who had recently relocated to Florida, because all contacts by phone and mail were directed to Florida, personal meetings occurred in Florida, and it was foreseeable that any harm resulting from the attorneys' conduct would be felt in Florida. Messerman's contacts, in contrast, were infrequent and few and the subject of the legal representation was the law and proceedings of Ohio.

In *Ores v. Kennedy*, 218 Ill.App.3d 866, 161 Ill.Dec. 493, 578 N.E.2d 1139 (1991), the appellate court validated the exercise of jurisdiction over a Texas attorney who was sued for contribution and accused by third party plaintiffs (an Illinois law firm who represented estate executors in Illinois and Texas) of malpractice based upon advice and regarding a stock sale for the estate of a former Illinois resident who, after the will was executed, moved to Texas, because he purposely directed his activities to Illinois residents, billing for time spent, corresponding by letter, and conversing with them by telephone. In *Resolution Trust Corp. v. Farmer*, 836 F.Supp. 1123 (E.D.Pa.1993), the court held that an out-of-state attorney accused of malpractice had sufficient contacts with Pennsylvania where the attorney, practicing in Georgia, agreed to represent a client located in Pennsylvania and authored opinion letters based on Georgia law in a real estate transaction. The lawyer voluntarily conducted business within Pennsylvania by agreeing to represent a Pennsylvania resident and a corporate citizen of Pennsylvania that relied to its detriment on the attorney's opinion letter. In

We adopt the analysis of those courts focusing on the defendant attorney's contacts with the forum state, rather than the analyses of those minority of courts relying on the site of the "effect of the injury" analysis. The U.S. Supreme Court in *Burger King Corp.* made clear that the "effect of the injury" analysis "is not a sufficient benchmark for exercising personal jurisdiction." *Burger King Corp.*, 471 U.S. at 471–76, 105 S.Ct. at 2174, 85 L.Ed.2d 528.

> [T]he constitutional touchstone remains whether the defendant purposefully established "minimum contacts" in the forum State. Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require,[1] the Court has consistently held that this kind of foreseeability is not a "sufficient benchmark" for exercising personal jurisdiction. Instead, the foreseeability that is critical to due process analysis [ ] is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. In defining when it is that a potential defendant should "reasonably anticipate" out-of-state litigation, the Court frequently has drawn from the reasoning of *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). (Citations and quotations omitted).

*Burger King Corp.*, 471 U.S. at 474–76, 105 S.Ct. at 2183, 85 L.Ed.2d at 542. Our focus, therefore, shall be on whether

---

Bond's case, the attorney-client relationship between himself and Messerman was created in Ohio. Also, Bond did not retain Messerman while a resident of Maryland to perform any legal work and Messerman did not bill him anew for any services or time spent regarding the expungement advice in 1994.

In *Miceli v. Stromer*, 675 F.Supp. 1559 (D.Colo.1987), the court held that an attorney based in California purposefully availed himself of the privileges of transacting business in Colorado by representing before the U.S. Tax Court in California a client living in Colorado, where the attorney's agents in Colorado recommended the attorney's services to the client, thereby indicating that the attorney solicited clients through an agent in the forum state. In contrast to the facts in *Miceli*, Messerman did not solicit Bond, directly or through an agent, while Bond resided in Maryland, nor did Messerman have agents in Maryland.

Messerman purposefully established minimum contacts in Maryland.

The relevant contacts by Messerman with Bond consisted of the alleged provision of legal advice by telephone and letters concerning the effect of and/or need for expungement of Ohio juvenile proceedings. The number of contacts over nine years were few and the number of those initiated by Messerman were fewer still. As the Court of Special Appeals pointed out, only two of the seven relevant contacts were initiated by Messerman: Messerman sent two letters to Bond in Maryland—one in January of 1986 and one in May of 1994. *Bond*, 162 Md.App. at 117, 873 A.2d at 431. The other five contacts were commenced by Bond. "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1239–40, 2 L.E.2d at 1298. The attorney-client relationship was created in Ohio in 1981. Messerman did not solicit business or advertise his professional services in Maryland. He maintained no office or agents in Maryland related to this action. He made no trips to Maryland. His former client telephoned and wrote him and he answered the phone and responded to two letters. He derived no additional revenue from the alleged provision in 1986 or 1994 of legal advice by telephone and letter. The content of all of these contacts strictly concerned Ohio law and events occurring, or supposedly occurring, in Ohio.

We hold that Messerman's contacts do not rise to the level of an "act by which the defendant purposefully avail[ed][him-]self of the privilege of conducting activities within the forum State" for purposes of a Maryland court exercising personal jurisdiction over him in this case. We conclude also that to exercise jurisdiction over Messerman would be unreasonable. We believe that any possible interest in favor of exercising personal jurisdiction over Messerman to provide a forum for an aggrieved client (or former client) residing in Maryland would not be served in this case because Maryland does not have an interest in regulating the incidental and occasional

contact between the attorney and the client under the circumstances of the present case.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**